UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14048-CR-CANNON/MAYNARD
CASE NO. 22-14054-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,

v.

DUSTIN SINGLETON,

   Defendant.

_____/

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTIONS TO SUPPRESS

Defendant Dustin Singleton ("Defendant") is charged in two criminal cases, both involving evidence seized during a traffic stop of Defendant's car on April 29, 2022.  Defendant has filed virtually identical Motions to Suppress ("Motions") in each case seeking to suppress all direct and derivative evidence stemming from the warrantless search of his car.  DE 81 [048]; DE 35[054].[1]

Defendant's Motions have been referred to me for a Report and Recommendation.  I held a multi-day evidentiary hearing on January 23-24, 2023, and on April 4, 2023.[2]  For the following reasons, I find that the warrantless search of Defendant's car was justified under Fourth

_____

[1] The Motions, briefing, and the admitted evidence are filed in the two separate cases. For ease of reference, citations to *U.S. v. Shaw et al.*, Case No. 22-14048-Cr-Cannon/Maynard, will be "DE __ [048]," and citations to *U.S. v. Singleton*. Case No. 22-14054-Cr-Cannon/Maynard, will be "DE __ [054]."  For ease of reference, I will cite principally to the filings in the first-filed case ending in 048.

[2] Shortly after what was believed to be the close of the evidentiary hearing on January 24, 2023, the Government notified defense counsel and the Court of a new development involving Ludlow's recognition of additional photos on his personal cellphone that were not previously disclosed.  This belated discovery generated a flurry of subsequent case activity, including a motion to reopen the suppression hearing to address the newly disclosed evidence.  This motion was granted and an additional hearing was held on April 4, 2023, at which time Lott and Ludlow both testified, and the late-disclosed photos and related reports were admitted into evidence.  While it is evident that state investigating officers had challenges uploading the photographic evidence and disclosing it to defense as early as they should have, nothing about the late disclosed photos impacted the outcome of the suppression motions or caused me doubt about the truthfulness of their testimony about what happened during the traffic stop.

Amendment jurisprudence and the subsequent state and federal search warrants also complied with constitutional requirements.  Thus, I recommend that Defendant's Motions be **DENIED**.

<u>**FINDINGS OF FACT**</u>

The following findings of fact are based on evidence presented at the evidentiary hearing, which consisted of testimony from seven witnesses:  Martin County Sheriff's Office ("MCSO") Sergeant Garrett Lott ("Lott");[3] MCSO Detective Tyler Ludlow ("Ludlow"); MCSO Detectives Nicholas Castoro and Cameron White; MCSO Deputy Stephen Hart; Assistant State Attorney ("ASA") David Lustgarten; and Homeland Security Investigations ("HSI") Special Agent Eric Urgo.  The evidence also included photographs and a video taken during and after the search of Defendant's car; police case reports and written MCSO policies; state and federal search warrants; and other exhibits described below.  My findings of fact are based, in part, on credibility determinations, after having observed all the witness testimony together with the other evidence presented.  Except where otherwise noted, I find that all the witnesses testified credibly.  *See U.S. v. Menendez*, 2000 WL 36733765, at *1 (S.D. Fla.Oct. 2, 2000) ("Rulings on motions to suppress involve mixed question of law and fact … [One]issue of fact … [is] the credibility of the witnesses.").

<u>**The Traffic Stop and Warrantless Search of Defendant's Car on April 29, 2023**</u>

On Friday, April 29, 2022, Lott and Ludlow were part of a MCSO Special Investigations Unit investigating a residence in Stuart, Florida for drug trafficking activity.  While conducting surveillance, they saw Defendant's car leave the target residence and travel southbound on US 1/Southeast Federal Highway.  At approximately 6:39 p.m., the officers stopped Defendant's car

---

[3] At the time of the events at issue, Lott was a Detective.  He has since become a Sergeant. For consistency's sake, I refer to him as either "Lott" or "Sgt. Lott" throughout this Report.

because the car's windows appeared to be illegally tinted.  At the time, Lott and Ludlow were together in an unmarked police car equipped with emergency lights.  Defendant was the driver and sole occupant of his car.  Photographs of the cars as they appeared on scene at the traffic stop have been admitted into evidence.  *See, e.g.,* Govt. Ex. 1, DE 118-1 [048].

Lott and Ludlow approached the front of Defendant's car together—Lott approached the driver's side while Ludlow approached the passenger's side.  Lott told Defendant that the traffic stop was for a suspected window-tint violation.  Lott asked Defendant for his driver's license, proof of insurance, and registration.  Defendant complied.  While Lott was speaking with Defendant, Ludlow tested the tint on the front passenger's window and determined that the window was illegally tinted under Florida law.

During the stop, Lott and Ludlow both saw black metallic knuckles in plain view on the center console near where Defendant was seated.  Defendant said he was doing artwork on the metallic knuckles for someone else; he had a knife in the back of the car that he was engraving for someone else;[4] and he was a convicted felon with pending firearms charges out of state.

After collecting Defendant's paperwork, Lott returned to the police car to run Defendant's information through dispatch.  Ludlow remained with Defendant, who was still seated inside the car's driver seat.  At some point, Deputy Hart arrived on scene as back up.  While Lott was running Defendant's information, a woman in a vehicle pulled up complaining about a domestic violence incident unrelated to Defendant's traffic stop.  Lott told her to pull into a nearby parking lot.  Deputy

---

[4] Defendant does not dispute having made this statement to officers about having a knife in the back of the car.  When he testified before me on January 19, 2023, Lott stated that the officers had to open the door to see the knife and it was not initially in plain view.  Lott recalled "standing and the door, and when [Defendant] mentioned it, looking back and seeing an object, but I could not see the full knife."  DE 132 at 77 [048].  During his later testimony before me on April 4, 2023, Lott testified for the first time that "from the driver's side of the vehicle, looking into the vehicle, I could see that there was a knife there" in plain view while talking to Defendant.  I find Lott's later testimony in this regard to be incredible and inconsistent with other credible evidence.  Thus, I do not credit his later testimony on this point – that he saw the knife in the back seat in plain view.

Hart went over to the parking lot to handle the domestic violence situation and then returned to the scene of the traffic stop.

Within about fifteen minutes from the initial stop, at approximately 6:53 p.m., dispatch advised Lott that Defendant was on probation or supervised release out of Connecticut and had been ordered by a court not to possess weapons.  Govt. Ex. 7, DE 118-7 [048].  This information was consistent with the NCIC teletype report Lott received indicating that Defendant was on "probation or supervised release status" and "violation of this order is an arrestable offense under 53a-222 violation of a cond[it]ional release please contact the bail commissioner at 2038761028 for further assistance client ordered by the court not to possess any weapons."  Def. Ex. 2, DE 104-2 at 3 [048].

In light of this information, Lott called Assistant State Attorney ("ASA") David Lustgarten for advice on how to proceed.  ASA Lustgarten testified that the State Attorney's Office has prosecutors on-call to advise on legal issues encountered by on-duty officers.  ASA Lustgarten received Lott's call on April 29, 2022.   ASA Lustgarten recalled multiple phone conversations with Lott that night.  During the first call, Lott asked ASA Lustgarten about the legality of the metallic knuckles he saw in plain view.  ASA Lustgarten told Lott he would research the issue and call him back.

Before ASA Lustgarten could do the research, however, Lott called him a second time to share the dispatch information that Defendant was on probation in Connecticut with a condition to not possess weapons.  Lott sought advice from ASA Lustgarten on the best course of action.  Specifically, Lott wanted to know if the officers could retrieve the weapons as evidence for Connecticut and if Defendant had committed an arrestable offense in Florida by violating his Connecticut release conditions.  ASA Lustgarten advised that the officers could retrieve the

weapons for documentation purposes but could not arrest the Defendant because there was no violation of Florida law. ASA Lustgarten recalled Lott mentioning the large knife in the back of the car during one of their later conversations. Although he could not recall the specifics, ASA Lustgarten testified that, if asked, he would have told Lott to retrieve the knife along with the knuckles as evidence.

Lott returned to Defendant's car and instructed Defendant to step out of the car so the officers could secure the metallic knuckles and the knife. Defendant complied. When Defendant exited the car, Lott saw a pocketknife partially hanging from Defendant's pocket. Defendant walked to the rear of the car where the contents of his pockets—including the pocketknife—were emptied and placed on top of the trunk of Defendant's car. Def. Ex. 9E, DE 125-9 at 6 [048]. Defendant was not handcuffed or under arrest. The officers intended to retrieve the metallic knuckles and knife for documentation purposes to inform the agency in Connecticut of Defendant's violation.

Ludlow opened the right rear car door to retrieve the knife from the right rear floorboard. The "first thing" Ludlow "noticed aside from the knife was a glass jar with assorted different colored pills." DE 132 at 123 [048]. Some pills were in baggies; other pills were loose inside the jar. The pills were packaged in a way that was "indicative of somebody selling them or being involved in some sort of drug trade." *Id*. The glass jar was right next to the large knife on the rear passenger floorboard. Next to the pills and the knife was a black toiletry bag with a green leafy substance that smelled like marijuana visibly hanging from a side pocket. Govt. Ex. 9, DE 118-9; Govt. Ex. 10C, DE 219-3 [048]. The officers arrested Defendant based on the pills and marijuana. Defendant was handcuffed and read his *Miranda* rights. Post-*Miranda*, Defendant stated that the jar of pills in the car was not his, but the marijuana belonged to him.

Based on the pills and marijuana, the officers searched Defendant's entire car. The car's interior contained an assortment of scattered items, including but not limited to a spray bottle, bags, a baseball bat, a shoebox, a cord, and other miscellaneous items. Govt. Ex. 10A, DE 219-1 [048]. There were many items to take out, go through, and put back inside the vehicle. At some point, the large knife was inadvertently put back in the vehicle and was not seized by law enforcement that night. During the search, law enforcement recovered methamphetamine, cocaine, fentanyl, marijuana, glass pipes, needles, two loaded firearms, unused baggies, prescription pill bottles with various controlled substances, ten (10) cellphones, three (3) tablets, and $1,104.00 in U.S. currency. A photograph of the evidence seized from Defendant and his car is admitted in evidence.[5] Govt. Ex. 2; DE 100-2 [048]. Defendant was arrested and transported to the Martin County Jail.

## Contact with Connecticut Authorities and Retrieval of the Knife

Four days after the traffic stop, on Tuesday, May 3, 2022, Ludlow contacted law enforcement in Connecticut and learned that Defendant was not on probation or supervised release as originally believed. Instead, Defendant was on pretrial release for felony firearm charges in Connecticut. As reported on a Criminal Appearance Bond issued by a Connecticut state court on January 11, 2022, Defendant's special conditions of release required that he "possess no weapons" and have "no new arrests." Govt. Ex. 5; DE 100-5 [048].

The car Defendant was driving was taken by police to a tow yard. On Friday, May 6, 2022, the registered owner of the car Defendant was driving the night of the traffic stop came to the

---

[5] At the hearing before me on April 4, 2023, defense counsel repeatedly suggested that the photographs taken by officers on the scene that night were somehow "staged." Defense counsel's staging theory would have one believe that the officers deliberately photographed items in such a way as to misleading suggest that those items were initially discovered in a certain way and placed within the car. I find no evidence to support such a theory, particularly considering the undisputed scattered state of miscellaneous items in the car at the time of the stop. Rather, after Ludlow opened the right rear passenger door and saw the knife, pills, and marijuana, the officers searched the entire car and photographed the items on scene to document what they found. I find nothing unusual, untoward, or nefarious about that procedure.

MCSO to retrieve her car keys. MCSO Detectives Castoro and White met with her and explained that the knife was inadvertently left behind in the car. With the car owner's consent, Detective White retrieved the knife from the car, after which the knife was logged into evidence. Govt. Ex. 4; DE 100-4 [048].

### The State Search Warrant for Evidence Relating to Narcotics Trafficking

On Friday, May 6, 2022, Ludlow applied for and obtained a state warrant to search the ten (10) cellphones and three (3) tablets that were seized from Defendant's car. The state warrant authorized law enforcement to search all 13 devices for any evidence "being kept and used in violation of Florida State Statute 893.135 Trafficking in Methamphetamine and Oxycodone." Govt. Ex. 6; DE 100-6 [048].

On May 7, 2022, Lott conducted a "GrayKey extraction" for seven of the seized devices. While reviewing the extraction of one of the cellphones labeled as "TL 107," Lott located multiple chats where Defendant discussed selling different types of narcotics at a tattoo shop. Lott also located multiple videos of Defendant having sex with a younger female inside the tattoo shop. There were also videos and images of narcotics and firearms throughout the tattoo shop.

### The Child Pornography Investigation

On July 9, 2022, MCSO Detective Matt Killough ("Killough") reportedly met with a confidential juvenile source ("CJS"), who provided information about Defendant. The CJS advised Killough that she knew Defendant through friends and that Defendant owned a tattoo shop in Port Saint Lucie. The CJS advised that Defendant asked for her to send nude images to him in exchange for money. The CJS met Defendant and co-Defendant Elijah Shaw ("Shaw") for the first time in person at the tattoo shop in December 2021. According to the CJS, Defendant sold narcotics and firearms from his tattoo shop and also exchanged narcotics and tattoos for sex, including with

minors.  The CJS told Killough that Singleton used numerous cellphones or iPads to record activities at his tattoo shop.

After Killough interviewed the CJS, Lott told Killough and another MCSO Detective about videos and images he saw on one of Defendant's devices.  Further investigation revealed chats and pictures evidencing that Defendant possessed, distributed and provided illegal drugs to others.  Law enforcement located videos that corroborated the CJS' reported illegal activity at the tattoo shop.

### The Federal Search Warrants for Evidence Relating to Child Pornography

On July 22, 2022, HSI Special Agent Eric Urgo applied for and obtained 13 federal search warrants for the electronic devices that were seized from Defendant's car. *See* Case Nos. 22-MJ-82-SMM through 22-MJ-94-SMM.  These warrants authorized the search of the devices seized from Defendant's car for evidence related to the possession and production of child pornography.  A forensic examination of some of the devices, including TL107, revealed evidence of the possession and production of child pornography by Defendant and Shaw.

On August 23, 2022, law enforcement obtained federal search warrants for Defendant's Apple ID and iCloud accounts. These warrants authorized law enforcement to search the Apple ID and iCloud accounts for evidence related to the possession and production of child pornography.  A forensic examination of the iCloud accounts revealed further evidence of the possession and production of child pornography by Defendant and Shaw.

### The Federal Indictments

On August 25, 2022, a federal grand jury returned an Indictment charging Defendant with possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine (Count One), possession of a firearm in furtherance of a drug trafficking crime

(Count Two), and possession of a firearm and ammunition as a convicted felon (Count Three). DE 3 [054].

On October 20, 2022, a federal grand jury returned a Second Superseding Indictment in a separate case charging Defendant and Shaw with production of visual depictions involving the sexual exploitation of minors (Count One), and Defendant with production of visual depictions involving the sexual exploitation of minors (Counts Two, Four, Five, Six, Seven, and Eight), and possession of visual depictions involving the sexual exploitation of minors (Counts Three and Nine). DE 39 [048].

## ANALYSIS

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'" *U.S. v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990)). The Supreme Court has "repeatedly affirmed" that "the ultimate touchstone of the Fourth Amendment is reasonableness." *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014)

In his Motions, Defendant argues that: (1) law enforcement lacked probable cause to search his car without a warrant; (2) the state warrant obtained by law enforcement to search the electronic devices seized from Defendant's car is overbroad and fails to satisfy the Fourth Amendment's particularity requirement; and (3) the affidavits submitted in support of the federal warrants contain reckless misstatements and omissions that render them constitutionally defective.

The Government responds that law enforcement had authority to conduct a protective search of the passenger compartment to secure the knife and had authority to retrieve the metallic knuckles and knife as evidence of a perceived violation of probation or supervised release. Moreover, the Government continues, the police had probable cause to search the entire car after observing assorted pills inside a clear glass jar and marijuana in the outside pocket of a toiletry bag. Lastly, the Government asserts that the state warrant is not overbroad and is sufficiently particularized; the federal warrant affidavits do not contain any material misstatements or omissions; and the good faith exception to the exclusionary rule precludes suppression of evidence in this case.

I will address each of Defendant's arguments in turn below.

## I.     Warrantless Search of Defendant's Car

Although not challenged in the Motions, I address as a threshold matter the constitutionality of the traffic stop of Defendant's car.  Under the Fourth Amendment, police may stop a car if they have probable cause to believe that a traffic violation has occurred.  *U.S. v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).  Additionally, "[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  *U.S. v. Brooks*, 448 Fed. Appx. 27, 29 (11th Cir. 2011).   "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials ... are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed."  *U.S. v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (quoting *U.S. v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983)).  The probable cause standard is objective, and the officer's subjective motives in executing the traffic stop are irrelevant.  *Whren v. U.S.*, 517 U.S. 806, 813 (1996).

The decision to initiate a traffic stop in this case was supported by probable cause. Under Florida law, driving with illegally tinted windows provides a valid basis for a traffic stop. *See U.S. v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) ("Under Florida law, it is a traffic violation to drive with illegal tints, and it provides a valid basis for a traffic stop. *See* Fla. Stat. § 316.2953."). Here, the evidence demonstrates that Defendant's car was initially stopped for a suspected window tint violation and subsequent testing established that the car he was driving had illegally tinted windows.

In considering the constitutionality of the officers' search of Defendant's car, my "analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. U.S.*, 389 U.S. 347, 357 (1967)). Two such exceptions apply: (1) law enforcement was authorized to conduct a protective search of the car based on the reasonable-suspicion-of-danger exception outlined in *Michigan v. Long*, 463 U.S. 1032 (1983); and (2) law enforcement was authorized by the automobile exception to retrieve the metallic knuckles and knife as evidence of a crime.

### A.      The Reasonable-Suspicion-of-Danger Exception to the Warrant Requirement

The Government maintains that the search of the rear passenger compartment of Defendant's car fell into the reasonable-suspicion-of-danger exception to the warrant requirement. It is axiomatic that officers conducting a traffic stop may "take such steps as [are] reasonably necessary to protect their personal safety." *U.S. v. Hensley*, 469 U.S. 221, 235 (1985). "This includes conducting a protective search of the driver, the passengers*, and the vehicle*." *U.S. v.*

*Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis added).  Officers "may seize any contraband, including weapons, in plain view."  *Id.*

In *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the Supreme Court held that an officer may stop and frisk someone where the officer "has reason to believe that he is dealing with an armed and dangerous individual."  Twenty years later, in *Michigan v. Long*, the Supreme Court explained that while *Terry* involved the stop and subsequent pat-down of a person, its reasoning also applied to justify the search of a vehicle.  *Long*, 463 U.S. at 1047; *see also Maryland v. Buie*, 494 U.S. 325, 332 (1990) ("In a sense, *Long* authorized a 'frisk' of an automobile for weapons.").  In reaching this conclusion, the Supreme Court explained:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id*. at 1049 (quoting *Terry*, 392 U.S. at 21).  Simply put, "where police have reasonable suspicion … to believe that a driver may be armed and dangerous, they may conduct a protective search for weapons not only of the driver's person but also of the passenger compartment of the automobile." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993).  The proper inquiry "is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id*.  The lawfulness of a search is generally viewed from an objective standpoint, not the officer's subjective belief.  *U.S. v. Lanzoni*¸639 F.2d 1293, 1300 (11th Cir. 2011).

Here, the officers had specific and articulable facts to believe Defendant may be armed and dangerous.  First, they knew Defendant had just left a residence known for drug trafficking. Second, Defendant was driving a car with darkly tinted windows with a disquieting and aggressive message emblazoned across the front, *to wit*, "F[*@]K AROUND AND FIND OUT!".  Third,

when they approached the car, officers saw a set of metallic knuckles in plain view on the center console.   Fourth, Defendant told the officers that he had a knife on the right rear passenger floorboard of the car.   Fifth, the officers knew, based on Defendant's own statements, that Defendant was a convicted felon with weapons charges pending out of state.   Sixth, Ludlow confirmed with dispatch that Defendant was under supervision in Connecticut and prohibited from possessing any kind of weapons.    Seventh, the officers had reason to believe Defendant was violating his supervision conditions because they saw metallic knuckles in plain view in his car and Defendant told them he had a knife.   Any "reasonably prudent" police officer in these circumstances would have a reasonable basis to believe, based on these facts and inferences reasonable drawn from them, that Defendant was armed and potentially dangerous.   Thus, the officers were justified under *Long* in searching the passenger compartment to retrieve the knife for officer safety.

In his Motions, Defendant contends that the officers were not justified in conducting a protective search because "Mr. Singleton was well away from the car and handcuffed with multiple officers at hand" when Ludlow went into the car to retrieve the knife.   DE 81 at 13.   Evidence from the hearing, however, shows that assertion is simply untrue.   The officers credibly testified that when Ludlow entered the car to retrieve the knife, the only officers on scene were Ludlow, Lott, and Hart.   Further, Defendant was not handcuffed and arrested until *after* Ludlow searched the rear compartment, found the knife, and observed suspected narcotics.   Until that point, the officers intended to retrieve the knife and metallic knuckles, and let Defendant go on his way since he was not to their knowledge violating any Florida laws apart from the routine traffic violation.   In *Long*, the Supreme Court specifically discussed situations, like this one, where a suspect had not yet been arrested and could return to his or her vehicle.   The Court noted that officers are "particular

vulnerable" during traffic stops because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long*, 463 U.S. at 1051-52.

Defendant also relies on MCSO Standard Operating Procedure 324.00(v)(A) to argue that officers were not authorized to search the passenger compartment of Defendant's car because Defendant was no longer in the car at the time of the search. *Long* makes clear, however, that the officers were entitled to search for the knife even after the Defendant was removed from the vehicle. *Long*, 464 U.S. at 1501 ("that both defendant and his passenger had been removed from the car and were in the officer's custody [was] inconsequential to the search."). Moreover, MCSO SOP 324.00(v)(A) is entirely inapplicable here. It provides that when an officer has probable cause to make a lawful arrest, he may search the person arrested and the area within that person's immediate presence to discover the fruits of the crime. MCSO SOP 324.00(v)(A). Here, as previously stated, law enforcement did not have probable cause to arrest Defendant before Det. Ludlow entered the car because there was no reason at that point to believe Defendant had violated Florida law other than the traffic violation. It was not until after Det. Ludlow entered the vehicle and saw drugs that Defendant was placed under arrest.

Defendant's other arguments are also unpersuasive. Defendant argues that officers should have obtained a warrant or confirmed the NCIC information before going into the car to retrieve the knife. That makes no sense. Taking time to obtain a warrant or call another state to confirm an NCIC report before retrieving a dangerous weapon during a traffic stop defeats the whole purpose of the exception, which is to avoid a potentially dangerous situation by immediately locating and securing any weapons. This is particularly important during a traffic stop. As recognized in *Long*, "roadside encounters between [officers] and suspects are especially hazardous,

and [] danger may arise from the possible presence of weapons in the area surrounding the suspect." *Long*, 464 U.S. at 1049.

Considering Defendant's possession of metallic knuckles, acknowledgment that he had a knife, acknowledgement that he was a convicted felon, statement regarding pending weapons charges out of Connecticut, recent departure from a known drug trafficking location, and prohibition from possessing weapons, the officers clearly had reasonable suspicion to believe Defendant was armed and potentially dangerous.  Officer safety dictated that Ludlow was entitled to search for and retrieve the knife.  Ludlow properly conducted a limited protective search, or vehicle frisk, for the knife by entering the right rear passenger compartment, which is precisely where Defendant indicated the knife was located.  There, he saw not only the knife but also marijuana and pills packaged consistent with drug trafficking, which provided probable cause to search the entire vehicle.

**B.**     **The Automobile Exception to the Warrant Requirement**

As another ground justifying the warrantless entry into Defendant's car, the Government argues that law enforcement had the authority to retrieve the metallic knuckles and large knife as evidence of a suspected probation or supervised release violation.  I agree that this was appropriate under the automobile exception to the warrant requirement.

It is well-settled that if a car is (1) readily mobile and (2) probable cause exists to believe it contains contraband, a warrantless search does not violate the Fourth Amendment.   *U.S. v. Williams*, 2023 WL 2785223, at *5 (11th Cir. Apr. 5, 2023) (citing *U.S. v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)).  "Once law enforcement agents have lawfully stopped a vehicle, they may conduct a warrantless search if there is probable cause—that is, if an officer under the circumstances could reasonably conclude—that the vehicle contains evidence of contraband."  *U.S.*

*v. Howard*, 2023 WL 1099856, at *3 (11th Cir. Jan. 30, 2023) (citing *U.S. v. Ross*, 456 U.S. 798, 809 (1982)).  The search may extend to "every part of the vehicle and its contents that may conceal the object of the search."  *Ross*, 456 U.S. at 825.

Here, as established by credible witness testimony and other evidence, Lott and Ludlow learned information leading them to reasonably conclude that the knuckles they saw in plain view and the knife described by Defendant constituted contraband because Defendant was prohibited by a Connecticut court from possessing weapons.  Lott took the additional step of calling a state attorney tasked with responding to legal issues encountered by on-duty officers to ask about the officers' authority to retrieve the weapons.  The state attorney who spoke with Lott testified credibly at the hearing that he ultimately advised Lott that the officers could retrieve the knuckles as evidence of Defendant's suspected out-of-state felony probation violation.  Although he did not specifically remember doing so, the attorney added that it would have made sense for him to have also told the officers to retrieve the knife for the exact same reason.

Defendant asserts that the officers' belief that Defendant was on probation or supervised release in Connecticut "was not objectively reasonable because objective well-trained officers would have contacted the bail commissioner in Connecticut to verify Mr. Singleton's status."  DE 105 at 5.  Notably, Defendant has not cited any authority in support of this assertion.  Defendant's argument is premised on a NCIC report that includes a phone number with instruction to "please contact the bail commissioner … for further assistance."  Def. Ex. 2, DE 125-2 [048].  However, the very same paragraph in the report states that Defendant is on "probation or supervised release status" and was "ordered by the Court not to possess any weapons."  *Id.*  Further, it clearly states that "violation of this Order is an arrestable offense under 53A222 violation of a conditional release."  *Id.* at 4.  The reference to "53A222" is consistent with Connecticut law providing that a

"person is guilty of violation of conditions of release in the first degree when, while charged with the commission of a felony, such person is released pursuant to subsection (b) of section 54-63c, subsection (c) of section 54-63d or subsection (c) of section 54-64a, and intentionally violates one or more of the imposed conditions of release."  Conn. Stat. § 53a-222(a).  Lott and Ludlow acted reasonably based on the pertinent information regarding a court-ordered prohibition against Defendant possessing any weapons.

The fact that law enforcement later learned that Defendant was on pretrial release for felony firearm charges in Connecticut as opposed to probation or supervised release is a distinction without a difference.  It is undisputed that Defendant's pretrial release conditions prohibited him from possessing any weapons.  Thus, the knuckles and large knife constituted potential evidence of a crime that the officers had authority to seize based on the circumstances known to them.

For all these reasons, the warrantless search of Defendant's car complies with Fourth Amendment principles and suppression is not warranted.

## II.     State Search Warrant

Defendant challenges the state warrant authorizing the search of the 13 devices seized from his car as an overbroad "prohibited general warrant" lacking in particularity and "not specifically tailored to the alleged criminal violations that are being investigated."  DE 81 at 13-16 [048].  I disagree.

Warrants must state with particularity the items to be searched or seized.  U.S. Const. amend. IV.  A warrant that fails to sufficiently particularize the place or things to be seized is unconstitutionally overbroad and the resulting general search is unconstitutional.  *U.S. v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000); *U.S. v. Mitchell*, 503 Fed.Appx. 751, 754 (11th Cir. 2013). A description is sufficiently particular if it enables the searcher to reasonably ascertain and identify

the things to be seized.  *U.S. v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011).  Technical perfection in the description is not required, but rather the Court should apply a practical margin of flexibility. *Id.*  The purpose of the particularity requirement is to "ensure[ ] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Roy v. U.S.*, 2021 WL 2269825, at *14 (S.D. Fla. Mar. 2, 2021) (citing *Maryland v. Garrison,* 480 U.S. 79, 84 (1987)), report adopted, 2021 WL 1975206 (S.D. Fla. May 17, 2021), certificate of appealability denied, 2022 WL 2703103 (11th Cir. Feb. 10, 2022).

Here, the state warrant authorized the search of the ten (10) cellphones and three (3) tablets seized from Defendant's car for:

> evidence in the form of text messages, emails, call logs (including all incoming and outgoing calls), contact list, internet history, previous GPS locations via applications, and photos stored on the property, relevant to proving a felony crime has been committed, which was being kept and used in violation of Florida State Statute 893.135 Trafficking in Methamphetamine and Oxycodone.

DE 125-6 at 9-11 [048].

The warrant's supporting affidavit states, among other things, that its affiant, Ludlow, was involved in the traffic stop of Defendant's car.  Ludlow sets forth a detailed description of the circumstances surrounding the stop, including that it was made for a suspected tint violation, that Defendant told officers he was a convicted felon with recent trouble out of Connecticut for possessing a concealed weapon, that Ludlow observed the metallic knuckles in plain view, and that Defendant said there was a large knife on the right rear floorboard.  *Id.* at 3-4 [048].  Ludlow describes the officers' receipt of information from dispatch that Defendant could not possess weapons and indicates that Ludlow went to retrieve the knife on the right rear floorboard at which

time he saw the glass jar with assorted pills and a nearby black bag with suspected cannabis in plain view. *Id.* at 4 [048].

According to Ludlow's affidavit, the subsequent recovery of several different types of narcotics from within Defendant's car was "indicative of a medium level drug trafficker/dealer with multiple customers" and that the presence of multiple cellphones "active[ly] receiving calls and messages" during the stop was consistent with known drug dealer "efforts to avoid investigative techniques used by law enforcement." *Id.*  Based on the information contained within his affidavit, Ludlow sought a warrant to search the 13 devices for "other unknown associates of the defendant that are involved in the violation of F.S.S. 893.135; trafficking of narcotics and/or other criminal activity …" *Id.* at 7 [048].

Contrary to Defendant's assertions, the state warrant is constitutionally sound.  It authorized the search of specified devices for evidence of specific criminal offenses with reference to the applicable Florida drug trafficking statute.  It describes and includes a photo of the electronic devices to be searched and expressly finds that Ludlow's affidavit established probable cause for its issuance.  And indeed, it did.  Ludlow's affidavit contained detailed and specific information about the traffic stop, the recovery of several types and amounts of illegal narcotics from within Defendant's car, and the ensuing investigation—including a well-founded suspicion that Defendant was likely using the multiple devices to engage in drug trafficking.  By the time Ludlow applied for the state warrant, authorities had collected abundant evidence suggesting that Defendant was engaged in drug trafficking as described in the affidavit.

Defendant contends that the state warrant was overbroad because the affidavit broadly sought to search for evidence of "other criminal activity" and the warrant permitted the search of 13 devices for "any and all data" with no temporal scope.  However, the warrant included more

concrete parameters.   For example, the warrant particularly describes the types of data to be searched, including text messages, emails, call logs, GPS information, internet history, and photos "relevant to proving a felony crime has been committed," all of which had to be "kept and used in violation of Florida Statute § 893.135 Trafficking in Methamphetamine and Oxycodone."   *Id.* at 10 [048].

In support of his contentions, Defendant cites the Eleventh Circuit case of *U.S. v. Blake*, 868 F.3d 960 (11th Cir. 2017).   *Blake* involved two defendants convicted of child sex trafficking for managing a prostitution ring involving at least two minors.   *Id.* at 966.   On appeal, the defendants challenged several pretrial rulings including the district court's denial of a motion to suppress evidence gathered as a result of search warrants served on Facebook.   *Id.* at 967.   The Eleventh Circuit described the Facebook warrants as requiring "virtually every kind of data that could be found in a social media account."   *Id.* at 974.   For example, the Eleventh Circuit noted that the Facebook warrants were not limited to messages involving suspicious persons and did not include any temporal limitations.   *Id.*   According to the Eleventh Circuit, such limitations would have undermined claims that the warrants were the internet-era equivalent of a prohibited "general warrant."   *Id.* at 974 (citing *Riley v. California*, 2488-91 (2014); *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

Ultimately, the Eleventh Circuit declined to decide if the Facebook warrants violated the Fourth Amendment's particularity requirement.   Instead, the Eleventh Circuit relied on the good faith exception to the exclusionary rule.   Specifically, the Court found that probable cause supported issuance of the warrants and the warrants were not facially deficient because, "while the warrants may have violated the particularity requirement, whether they did is not an open and shut

matter" such that the agents who executed them reasonably believed them to be valid.  *Id.* at 974-75 (citing *U.S. v. Leon*, 468 U.S. 897 (1984)).

Unlike the *Blake* warrants directed to Facebook accounts, the state warrant here encompassed electronic devices seized by law enforcement incident to Defendant's arrest.  The warrant specifically limited the content that could be seized to evidence on the 13 devices which was "kept and used in violation of Florida Statute § 893.135 Trafficking in Methamphetamine and Oxycodone."  DE 125-6 at 10 [048].  Although no time frame is specified, the warrant provides other limitations on the data that could be searched by tying the data to a specified crime.   This requisite tie to a specified crime is indicative of a particularized warrant.

Defendant's reliance on *U.S. v. Mercery*, 591 F.Supp.3d 1369 (M.D. Ga. 2022) is similarly misplaced.   *Mercery* involved an Instagram warrant found "even broader than the warrants described in *Blake*" and with "absolutely no limitation on what data law enforcement could seize after Instagram's broad disclosure" encompassing "eighteen broad categories of information."  *Id.* at 1381-82.  The warrant there was "not tailored to evidence of the crimes under investigation, the time period during which Mercery allegedly committed the crimes, or the persons allegedly involved in the crimes."  *Id.*  Here, by contrast, the warrant is not directed broadly to a social media account and is sufficiently tailored to evidence of the drug trafficking crimes under investigation involving Defendant.

Lastly, even assuming *arguendo* that the state warrant was constitutionally infirm, the good faith exception would apply just as it did in *Blake*.  First, as found above, probable cause supported issuance of the warrant.  Second, the warrant was not so facially deficient that the executing officers could not have presumed it to be valid.  Ludlow submitted a detailed sworn application and obtained the warrant from a neutral and detached state court judge.  There is no evidence to suggest Ludlow

misled the issuing judge or withheld pertinent information about the ongoing investigation. Authorities therefore acted in objectively reasonable reliance on the issued warrant and acted within its scope.

For all the above reasons, Defendant's challenges to the state warrant are without merit.

**III.    Federal Search Warrants**

Lastly, Defendant contends that Agent Urgo intentionally or recklessly included false or misleading statements and omissions in his search warrant affidavit submitted in support of the federal warrants.

In *Franks v. Delaware*, the Supreme Court set out the standard for considering an attack on the veracity of an affidavit supporting a search warrant.   To mandate an evidentiary hearing under *Franks*, an attack on the veracity of an affidavit "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  *Id.* at 171. "Allegations of negligence or innocent mistake are insufficient;" there must be "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof" that "specifically points out the portion of the warrant affidavit that is allegedly fallacious, and a statement of reasons indicating why this is so." *Id*.

If the above requirements are met, a court then considers whether, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause."  *Id.* at 171-172.  If so, no evidentiary hearing is required.  If not, the defendant is entitled to a hearing.  *Id.*; *see also U.S. v. Cross*, 928 F.2d 1030, 1040 (11th Cir. 1991) (to merit an evidentiary hearing on a *Franks* claim, a defendant must make a substantial preliminary showing that (1) the affiant deliberately or

recklessly included false statements in the affidavit and (2) the misrepresentation was essential to the finding of probable cause).

According to Defendant, Agent Urgo falsely stated that (1) Defendant was *Mirandized* before the large knife was retrieved, (2) Ludlow saw and smelled marijuana before retrieving the large knife, and (3) Ludlow said the glass jar he found in Defendant's car contained contraband. As an initial matter, Defendant mischaracterizes Agent Urgo's actual affidavit statements. Regarding *Miranda*, for example, Agent Urgo reported simply that on the night of the traffic stop, "A detective also advised [Defendant] of his Miranda rights."  This statement is consistent with testimony adduced at the hearing.  The same is true of the statement about Ludlow seeing and smelling marijuana.  Ludlow testified that he told Agent Urgo that he smelled marijuana and that he indeed did smell the marijuana "once making contact with it."  DE 132 at 170-71 [048].

More importantly, Defendant offers no reason to believe Agent Urgo made any statements falsely or with reckless disregard for the truth.  Agent Urgo was not at the scene of the traffic stop and never claimed to have personal, firsthand knowledge of what took place on April 29, 2022. Indeed, at the outset of his affidavit, Agent Urgo states that the information he provides is based in part on his "own knowledge of the facts and circumstances surrounding this investigation from my own investigative efforts, as well as from information obtained from other law enforcement officers with personal knowledge of the evidence and activities described herein."  There is no evidence that the affidavit's statements were anything other than Agent Urgo's good faith recounting of a complex investigation involving numerous details learned from other investigating officers.

Further, these statements are not material in that they were not essential to a finding of probable cause.  Defendant's conclusory claims about statements concerning the timing of *Miranda* warnings, when Ludlow saw and smelled marijuana in relation to retrieving the large knife, and

Ludlow's use of the term "contraband" in reference to the glass jar simply do not rise to the level of establishing material misstatements, deliberately or recklessly made, affecting the overall probable cause analysis needed to justify the search of the devices.  On the contrary and under the totality of circumstances, the comprehensive and detailed affidavit supporting the federal warrants demonstrated a fair probability that evidence of the child exploitation crimes under investigation would be present on the devices seized from Defendant's car.

Defendant also contends that Agent Urgo deliberately failed to include material information about the pendency of carjacking charges against the confidential juvenile source ("CJS") at the time she made her statements against Defendant and Shaw.   In addition to statements or misrepresentations, *Franks* also applies to information omitted from warrant affidavits.   An affidavit violates the Fourth Amendment if it contains omissions "made intentionally or with a reckless disregard for the accuracy of the affidavit." *U.S. v. Morales*, 2019 WL 572660, at *3 (S.D. Fla. Jan. 9, 2019) (citations omitted), report and recommendation adopted, 2019 WL 210717 (S.D. Fla. Jan. 16, 2019), aff'd, 987 F.3d 966 (11th Cir. 2021).  Direct evidence of a reckless omission is not necessary; "rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.'" *Id.*  Omissions that are negligent, insignificant or immaterial do not violate the Fourth Amendment and even intentional or reckless omissions will invalidate a warrant *only if* inclusion of the omitted facts would have prevented a finding of probable cause. *Id.*

Defendant's argument fails because including information about the CJS's carjacking charges would not have prevented a finding of probable cause. In addition, there has been no showing that Agent Urgo deliberately omitted this information for the purpose of misleading the issuing judge. *See U.S.  v. Whyte*, 928 F.3d 1317, 1334 (11th Cir. 2019) (detective's awareness of

a source's criminal history and decision not to include it in his affidavit did not prove he acted deliberately for a *Franks* violation because there must be an affirmative showing that "the omission must have been made with the purpose of misleading the judge issuing the warrant"); *U.S. v. Novaton*, 271 F.3d 968, 988 (11th Cir. 2001) (finding no deliberateness or reckless disregard when an agent knew an informant's criminal history but omitted it from his affidavit and noting district court observation that "judges are accustomed to dealing with information derived from informants, and are well aware that such information is often obtained in the context of personal rancor and mixed motives."). Although a *Franks* hearing is not warranted, Agent Urgo provided limited testimony at the evidentiary hearing regarding this issue. He testified that he did not include information about the carjacking charge out of concern for the CJS's safety, which is consistent with what is routinely done in investigations like this one involving victims of child exploitation crimes. Disclosing the carjacking charge could have led to the unwanted disclosure of the CJS' identity.

In sum, there is no valid reason to believe Agent Urgo recklessly or deliberately made material misstatements or omissions designed to mislead the issuing judge. The federal search warrants are valid and suppression of any evidence flowing from their execution is unwarranted.

## RECOMMENDATION

Based on the foregoing, I respectfully recommend that Defendant's Motions to Suppress DE 81 [048]; DE 35 [054] be **DENIED**.

## NOTICE OF RIGHT TO OBJECT AND SHORTENED OBJECTIONS PERIOD

Given the swiftly-approaching trial date and in the interest of promoting judicial economy and finality to the parties, a prompt resolution of this Report and Recommendation is required. As such, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern

District of Florida Magistrate Judge Rule 4(a).   Accordingly, the parties shall have **SEVEN (7) DAYS** from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Aileen M. Cannon.  *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a).  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016). **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within THREE (3) DAYS of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 21st day of April, 2023.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE